KERMIT LAMAR BLACK, SR., D/B/A ROCK WOOL INSULATING COMPANY v. EDWIN M. CLARK AND WIFE, MILDRED RECTOR CLARK

No. 7722DC253

(Filed 2 May 1978)

Contracts § 21.2— contract to install aluminum siding—substantial performance—failure to instruct—error

Where a contract is substantially performed, damages equalling the contract price less allowances for defects in performance or damages for failure to comply with the contract strictly may be recovered; therefore, the trial court erred in failing to instruct the jury on a substantial performance or to submit such issue to the jury where plaintiff claimed and his evidence showed that he substantially performed his contract with defendants to install aluminum siding on their house and defendants refused to allow him to complete performance.

ON writ of certiorari to review proceedings before *Cornelius, Judge*. Judgment entered 10 November 1976 in District Court, IREDELL County. Heard in the Court of Appeals 30 January 1978.

This action was brought to recover the amount allegedly due by defendants on a contract to install aluminum siding on defendants' home in Iredell County. The complaint alleges that the parties entered into a contract under which plaintiff agreed to "[i]nstall Reynolds antique Vinyl-tuf white ivory Roughwood 8″ laminated to entire home. Box in overhand with alum. Soffit and fascia. Cover front porch ceiling with vertical aluminum. Cover front porch plate. Cover window sill with alum. Trim outdoor in alum. + vents $20 + alum foil $50". Defendants agreed to pay $3927.50 plus the $70 for the vents and aluminum foil. The complaint further alleged that plaintiff proceeded to furnish building materials and labor to defendants but that on 17 November 1975, the defendants ran plaintiff's workmen off the premises and since then refused to allow plaintiff to complete the work; that the contract was then substantially (at least 80%) completed "except for the correction of certain minor items and the completion of the siding installation"; that the defendants have failed and refused to pay for the materials and labor; that notice of lien was filed in the office of the Clerk of Superior Court of Iredell County; that defendants are indebted to plaintiff in the amount of $4007.50 with interest from 17 November 1975.

Defendants answered, admitting the contract, the fact that defendants ran plaintiff's workmen from the premises, and their refusal to pay but denying that the work was substantially completed or that plaintiff had properly furnished materials and labor. By way of counterclaim the defendants alleged that the plaintiff did not use the material specified in the contract, failed to install the aluminum properly, and failed to cover the house with aluminum foil. They asked for $5500 compensatory damages, $5000 punitive damages, and $1000 attorney fee.

Plaintiff denied all material allegations of the counterclaim.

At the close of the evidence, the court granted plaintiff's motion for a directed verdict as to defendants' claim for punitive damages.

The plaintiff tendered issues which would have allowed the jury to determine whether defendants breached the contract or unreasonably prevented plaintiff from completing the contract and whether plaintiff substantially performed the contract in accordance with its terms and provisions. The court refused to submit the tendered issues and, instead, presented issues as follows:

"1. Did the plaintiff perform the contract in accordance with the terms and conditions agreed to by the parties?

2. If so, what amount, if any is the plaintiff entitled to recover of the defendants?

3. Did the plaintiff fail to perform the contract in accordance with the terms and conditions agreed to by the parties as alleged in the Answer and Counterclaim?

4. If so, what amount, if any, are the defendants entitled to recover of the plaintiff?"

The jury answered the first issue "No", the third issue "Yes", and the fourth issue "$2500.00". From judgment entered on the verdict, plaintiff gave notice of appeal. Plaintiff docketed the record on appeal after expiration of the time provided by Rule 12(a), North Carolina Rules of Appellate Procedure, and defendants, in apt time, filed a motion to dismiss the appeal. Plaintiff concedes that the record was filed nine days late but attributed the delay to defendants' failure to stipulate to the record until the 39th day after service of the record on him. Plaintiff requests that, under

Rule 21, we treat the purported appeal as a petition for a writ of certiorari. This we have done and have allowed the petition in order that we may review the case on its merits.

*Randy Duncan for plaintiff appellant.*

*Sowers, Avery and Crosswhite, by William E. Crosswhite, for defendant appellees.*

MORRIS, Judge.

Plaintiff's evidence is summarized as follows: The contract was entered into on 16 September 1975, and the work was begun on or about 29 October 1975 and continued smoothly until Mrs. Clark, on 19 November 1975, ordered the workmen to leave the job and locked the gate. At that time the work was 75% to 80% completed. Shortly after the work was begun, Mrs. Clark called to plaintiff's attention the fact that there was some Kaiser material on the job and she wanted Reynolds. The Kaiser was taken up and Reynolds material brought to the job in its place. The work crew was changed because the original crew was not experienced in putting up soffit. The second crew was experienced and had been working for plaintiff for 20 years. The Clark job entailed the use of backer board and when that is used, aluminum foil as additional insulation is totally valueless. The Clarks wanted the aluminum foil, and plaintiff agreed to put it up virtually at cost. When all Reynolds aluminum is used, the Reynolds Company gives a 30-year guaranty. No other aluminum was used than Reynolds. Although the Reynolds specifications call for the use of aluminum nails, the Company will issue the same guarantee if a steel-coated nail is used because, although the aluminum nail won't rust, it cannot be driven in old hard pine. The Clark house was probably 100 years old and built of old hard pine. The steel-coated nails are not exposed to the weather and "it's not correct that the nails we used after a while will turn bad and rust". The Reynolds aluminum factory has verified the use of steel-coated nail. "In my experience the recommended proper spacing of nail in aluminum siding is not more than 16 inches when the application is direct to studs and not more than 20 inches when the application is over sheathing . . . And my company follows those practices." There were certain deficiencies in the job when the work was examined in January. The aluminum was not cut to fit

the porch ceiling properly, and it wasn't locked. The porch ceiling was poorly done. Mr. Clark pointed this out, and plaintiff agreed. Plaintiff was going to take it all down and redo it. There were some loose pieces of siding, because the siding didn't go up to the boxing. There were two or three feet left with no siding on it, so it was loose. This was natural since plaintiff had not been allowed to finish it. Some of the trim around the doors and windows needed reworking. When plaintiff talked to defendants in November, he offered to fix the deficiencies and his estimate of the cost to do so would be $500.

At time of trial plaintiff had, including materials and labor, between $3000 and $3500 in the job. Plaintiff did not know of any complaints until notified that workmen had been dismissed. After the workmen were dismissed, plaintiff met with defendants and attempted to work out the problems. Plaintiff made defendants three offers: (1) To finish the job with a different crew, (2) to take the siding down and make a charge at that time, (3) settle up then on a percentage basis for what had been done. Although plaintiff contacted defendants several times, no agreement was reached.

Unused materials at the site amount to $905.

A workman testified that nails in the siding were spaced approximately two feet apart, and there was foil back of all the siding.

An employee of Reynolds testified that his Company issued a warranty with either aluminum or coated nails.

When Mrs. Clark dismissed the workmen, she used abusive, profane language, cursing the workmen and blocking his truck with her car.

Defendants' evidence was in conflict with plaintiff's evidence in several respects. They testified that materials other than Reynolds were used; that the nails were over 24 inches apart; that some of the siding did not fit and there were gaps; that some of the nails were rusty and bent; that there were areas which did not have aluminum foil under the siding; that the deficiencies were pointed out to plaintiff's employee who said that it was the best he could do; that they then instructed him to stop work and locked the gate to prevent his returning; that Mrs. Clark did not curse the employee; that plaintiff never contacted defendants

Black v. Clark

about correcting the deficiencies except once in January when he asked them to sign a statement that they would not come to the site and harass the workmen while repairs were being made; that defendants had the house inspected by the County Building Inspector who found that the siding did not meet the manufacturer's specifications in several respects; three different types of siding had been used, gap in the fascia allowed water to get underneath the siding, the nails were 30 to 48 inches apart on the exposed top row of siding, the aluminum foil had not been brought around the corners of the house, the products of three different manufacturers were on the site and some pieces of aluminum were missing from some of the boxes; that in defendants' opinion the house had a fair market value of $25,000 prior to plaintiff's work and $20,000 after defendants stopped the work; that defendants have not been able to complete the house and move in because the heating system and carpet could not be put in until the aluminum siding was put on.

It appears obvious that plaintiff's complaint is bottomed on substantial performance and defendants' refusal to allow him to complete performance. His evidence supports that theory. "It is now stated as the general rule that substantial performance of a contract will support a recovery of the contract price less allowances for defects in performance or damages for failure to comply with the contract strictly." 17 Am. Jur. 2d, Contracts, § 375, p. 818; Corbin on Contracts, Vol. 3A, § 701, p. 314; 17A C.J.S., Contracts, § 508, p. 812 *et seq*. While the doctrine of substantial performance is not limited in its application to construction contracts, it is readily apparent that building and construction contracts certainly lend themselves to the application of the doctrine. It has been said that the doctrine was conceived for use in a situation where the obligor-plaintiff has given the obligee-defendant a substantial portion of that for which he bargained and the performance is of such a nature that it cannot easily be returned. *Diamond Swimming Pool Co. v. Broome*, 252 S.C. 379, 166 S.E. 2d 308 (1969). In *Lumber Co. v. Construction Co.*, 249 N.C. 680, 684, 107 S.E. 2d 538, 540 (1959), the Court said:

> "Where a building contract is substantially, but not exactly, performed, the amount recoverable by the contractor depends upon the nature of the defects or omissions. 'Where the defects or omissions are of such a character as to be

capable of being remedied, the proper rule for measuring the amount recoverable by the contractor is the contract price less the reasonable cost of remedying the defects or omissions so as to make the building conform to the contract.' Annotations: 134 Am. St. Rep. 678, *684*; 23 A.L.R. 1435, *1436*; 38 A.L.R. 1383; 65 A.L.R. 1297, *1298*."

We think this is a case in which the doctrine is applicable. Whether there has been substantial performance of a contract is one of fact for the jury under proper instructions from the court. Here the jury was not instructed with respect to substantial performance, nor was any issue presented to the jury for determination. This was error and entitles plaintiff to a new trial. We note that the Pattern Jury Instructions for Civil Cases contain suggested issues and instructions thereon for use in cases involving substantial performance of contracts.

Plaintiff has assigned as error rulings of the trial court with respect to the admission of evidence for defendants. We have examined those assignments of error and find them to be without merit.

New trial.

Judges VAUGHN and ERWIN concur.